Frederick J. McMANUS, Jr., a minor, by his father and next friend, Frederick J. McManus, Sr., and Frederick J. McManus, Sr., individually, Plaintiffs,

v.

Winifred ROGERS, Defendant.

Civ. A. No. 1046–58.

United States District Court
District of Columbia.

May 11, 1959.

Frank F. Roberson, and John J. Ross, Hogan & Hartson, Washington, D. C., for plaintiffs.

Douglas A. Clark, Washington, D. C., for defendant.

KEECH, District Judge.

This case is before the court on the motion of counsel for plaintiffs for a reconsideration of the court's direction of a verdict for defendant as to both plaintiffs at the close of plaintiffs' case.

The action for personal injuries is brought by Fred J. McManus, Jr., and his father against Mrs. Winifred Rogers as the result of serious injuries sustained by Fred on August 28, 1957, when he fell from the outside rear deck of the defendant's car while it was being operated by defendant's son Tom. Plaintiffs' evidence shows that Fred, with four of his friends, had attended an "open house" of a teen-age church group of which he was not a member. He had not attended any of its functions before and did not know the defendant's son. It was customary with this group for members having cars to furnish the others without cars transportation home. After the party broke up there came a time when defendant's son was the only member left who had a car, and there were too many persons without transportation for his car to accommodate. Tom refused to try to take all of them and made a number get out of the car. Another car came along and took about four. About six remained in the back seat, with three in the front. One of Fred's friends tried to ride on the front fender but was ordered off. Thereafter he got on the rear deck, and at some point the plaintiff Fred also got on the rear deck and rode there. The car started off up Garrison Street toward 39th slowly, because of the load; it made a left and right turn at 39th where there is a jog in Garrison Street, and then started down hill toward Belt Road at an increased speed, never exceeding twenty-five miles an hour. Before reaching the curb line of the intersection Tom started a wide turn into Belt Road, which

he did not complete, as he came to a full stop when it became known that someone had fallen from the rear of the car. Thereafter, Fred was found lying unconscious on the pavement somewhere in the intersection. Because of his serious injuries Fred did not regain consciousness for some time, and he now has no recollection of a period beginning some two weeks before the accident until he regained consciousness in the hospital some weeks thereafter, including the time of the accident.

Since we recessed yesterday, I have reconsidered the defendant's motion for a directed verdict in the light of the further argument of counsel for plaintiffs.

This further argument was based on two principal contentions: (1) that at the time of the accident the plaintiff Fred McManus, Jr., occupied the status of a licensee by implied invitation, to whom the defendant's son and agent owed the duty of reasonable care (citing Firfer v. United States, 1953, 93 U.S.App.D.C. 216, 219, 208 F.2d 524, and Gleason v. Academy of the Holy Cross, 1948, 83 U.S. App.D.C. 253, 168 F.2d 561); and (2) that even if McManus, Jr., were only a bare licensee or trespasser, the defendant's son and agent owed him the duty of reasonable care not to injure him through *active* negligence (citing Radio Cab, Inc. v. Houser, 1942, 76 U.S.App. D.C. 35, 128 F.2d 604, and Prosser Law of Torts (1955 ed.) § 76, p. 432), the intentional, willful, or wanton limitation on one's duty to a trespasser or bare licensee, stated in the Firfer opinion, being applicable only in the case of *passive* negligence.

Again, I repeat, in passing upon this motion the evidence must be viewed in the light most favorable to the plaintiffs and every favorable inference indulged in the plaintiffs' behalf.

My further review of the evidence and consideration of the additional authority supplied by counsel for plaintiffs, as well as such independent research as I have been able to accomplish, has brought me to the following conclusions:

First, the driver of a car has the duty to any trespasser whose presence is not known to him to refrain from intentional, willful, or wanton negligence. If the presence of the trespasser becomes known to the driver and he tolerates or acquiesces in continuance of the trespass, the trespasser becomes a licensee by acquiescence or, as it is sometimes called, a bare licensee. To either a trespasser whose presence is known or may reasonably be known or a bare licensee, the driver owes a duty to use reasonable care not to commit any negligent act which will create a danger to the trespasser or bare licensee.

I find no case in the District of Columbia directly in point, but this view would be in line with the rationale of the Radio Cab and Firfer cases as I interpret them together, as well as cases from other jurisdictions and treatises of various text writers concerning the changing law as to the duty owed a bare licensee or trespasser whose presence is known or reasonably should be known. Further, it is in accord with the modern concept of social responsibility to approve a duty on all persons to exercise reasonable care not to endanger by any affirmative act other persons who are known or reasonably should be known to be within the foreseeable risk.

The Radio Cab decision is not clearly dispositive of the rule applicable to this case, although it dealt with the distinction between active and passive negligence. While the opinion terms the plaintiff in that case a "licensee", without any descriptive qualification, it is clear from the facts recited that he was a licensee by invitation, having entered the premises for his own purpose after express permission by the owner's agent, and the permissive nature of his entry was accented in the court's opinion.

The basis of the court's ruling in the Radio Cab case is summarized in its quotations from other cases (at page 37 of 76 U.S.App.D.C., at page 605 of 128 F.2d):

"* * * *a person who merely gives permission* to pass and repass

along his close is not bound to do more than allow the enjoyment of such permissive right under the *circumstances in which the way exists*; * * * The grantee must use the *permission* as the thing exists. It is a different question, however, where negligence on the part of *the person granting the permission* is superadded. It cannot be that, *having granted permission* to use the way subject to existing dangers, he is to be allowed to do any further act to endanger the safety of the person using the way. The plaintiff took the *permission* to use the way subject to a certain amount of risk and danger, but the case assumes a different aspect when the negligence of the defendant * * * is added to that risk and danger." (Gallagher v. Humphrey (1862), 6 L.T. N.S. 684, cited in Sec. 95 of Harper on Torts.) Emphasis supplied.

And again:

" * * * the *licensor* has, however, no right to create a new danger *while the license continues.*" Stevens v. Nichols, 155 Mass. 472, 29 N.E. 1150, 1151, 15 L.R.A. 459. Emphasis supplied.

The Firfer decision, later in time, clearly defines "licensees by invitation", "bare licensees" and "trespassers", and distinguishes between the degrees of care owed the various classes, holding that a bare licensee or trespasser may recover only for intentional, willful, or wanton negligence. Firfer, however, dealt only with passive negligence.

In line with modern developments in the law, it is the view of this court that on an appropriate fact situation one might anticipate that the ruling in the Radio Cab case would be extended from the permissive status there dealt with to a holding that one who has notice of, or reasonably should foresee, the presence on his property of bare licensees or trespassers should exercise reasonable care not to endanger them by any affirmative act of negligence on his part which would create a new danger over and above hazards already existing on his property.

Second, bearing these principles in mind, I find the evidence shows, as a matter of law, that at the time he got on the car the plaintiff Fred McManus, Jr., occupied the status of a trespasser on the automobile, his precarious position having been selected by himself without permission, express or implied, which might have raised him to the status of a licensee by invitation. Even assuming an invitation to ride *inside* the defendant's automobile might be implied from the circumstances surrounding the preceding party, the positive testimony of eyewitnesses, as well as the presumption of due care on the part of defendant's agent, negate any express or implied invitation to ride on the *outside* rear deck of the car. There is no evidence in the case upon which a contrary finding could reasonably be based.

Third, I find, as a matter of law, that there is insufficient evidence of record upon which the jury could base a finding that Tom, the defendant's agent, became aware of Fred's trespassing presence on the outside of the car in time for him either to object thereto or to acquiesce therein before Fred fell from the vehicle. Hence, there is no evidence upon which to predicate a finding that Fred acquired the status of a licensee by acquiescence, or bare licensee, in the course of his ride on the outside of the car.

Fourth, I find as a matter of law that there is insufficient evidence in this record for any reasonable man to base a finding thereon that Tom had any actual knowledge of Fred's presence on the outside of the car, or reasonably should have known of his presence under the physical facts and circumstances then existing, in time to have taken any precautions for his safety other than what Tom did.

According to the testimony of plaintiffs' witnesses, when the car left its parking place there were three passengers in the front seat and about six more

in the back seat, all teen-agers, happy and noisy after the party, with much conversation and confusion inside the car. To summarize the evidence as to actual or constructive notice to Tom of Fred's presence on the rear deck of the car:

Paul Murray, who had come to the party with Fred, testified that when they left the party there were a group of people around the defendant's car and in the car; that he was able to get a place inside the car next to the right rear window; that Fred got on the outside of the car on the right rear fender, just through the window from him; that there were a lot of people trying to get in—he did not know how many, but entirely too many, whom he estimated at ten or fifteen, and later said were "about fifteen at first"; that after a while another car came along and took some of the people; that there was some argument; that Tom refused to take them all and some got out of the car; that finally Tom drove off; that he, Paul, looked back at Fred a couple of times, when they started off and then again; that as Tom was turning at the Belt Road intersection he, Paul, looked back to see if Fred was all right and saw him on the road in the street and somebody hollered Fred had fallen. Paul testified further that he knew Fred was on the right rear deck of the car; that he looked for Fred because they had come to the party together; that he did not know whether the driver saw Fred on the back of the car; that he could not remember that Tom said anything about it; that he did not remember telling Tom anything about Fred being on the back of the car; that there was an awful lot of conversation and "awful noise" inside the car; that he did not know that anyone else in the car told Tom of Fred's presence; that he did not remember Tom saying anything indicating he knew of Fred's presence; that it was while Tom was in the turn that somebody said Fred had fallen off, and that was the first indication he knew of anybody saying Fred was on the automobile.

Michael Dundon, another boy who went with Fred to the party, testified that when they came out he got in the back seat of Tom's car, "next to the next to the back door" and farther to the left than to the right; that he saw Fred on the right rear fender outside; that Bill Linton got on the left front fender at first, then, just after the car started up, Bill got off the front and transferred to the left back fender; that Bill went along the driver's side; that he did not recall feeling him get on the rear. Michael testified that Fred fell from the right rear fender of the car when Tom was making the turn into Belt Road and that someone in the car said Fred had fallen off. He did not tell Tom that Fred was on the rear of the car and did not recall anyone in the car doing so, and he repeated that it was when Tom was making the turn that somebody said, "Fred has fallen off", or words to that effect.

The remaining eyewitness, Kathai Allen, on whose testimony counsel for plaintiffs relies heavily, gave similar testimony as to what transpired on leaving the party. She said that after the other car had taken about four people, they tried over again to get everyone into Tom's car, that it was quite a crowd, and that she did not believe everyone was able to get in; that she thought there were some who did not get in, but she did not then see anyone on the outside of the car; that just as they pulled out of the parking space and were starting up the hill, one of the boys, later identified to her as Bill Linton, jumped on the left front fender; that as soon as he got on, Tom stopped the car and asked him to get off, saying Bill was obstructing his vision; that in the block between 39th Street and Belt Road, she became aware that somebody was on the back of the car; that she recalled, a very short time before they made the turn on to Belt Road, someone made some remark to the effect that someone was on the back of the car; that she would say this occurred not more than half a block east of Belt Road. When asked to trans-

late "half a block" into the number of houses, she said "no more than four houses". This did not clarify the distance from Belt Road, since the record is devoid of any explanation of what sort of "houses" she meant. She stated further that, earlier, after Tom had stopped the car and Bill Linton had gotten off the front fender at his request, she though she heard a sound like a "thud", but she did not know what it was. She said that at the time the persons got out of the car at Tom's request, she did not know there was anybody else on the back of the car; that nobody said anything to Tom about somebody being on the car; that there was a remark about somebody being on the back of the car, but it was impossible to say whether it came from the front or rear seat; that she did not know whether Tom heard the remark or not, and that there was nothing to indicate to her that Tom knew the boy was on the car.

The only remaining evidence bearing on notice to Tom of Fred's presence on the outside of the car is the statement given by Tom to the police officers at the scene after the accident, as recorded in the police report. This reads:

"* * * and when I left the party everyone jumped in my car and I told them it was too many and some got out and got in another car. I don't know whether there was one, two, or three that jumped on the back of the car. Somebody said, 'There is somebody on back of the car,' and when I came up the hill I either stopped for a stop sign or slowed down and I thought one of them jumped off, as I saw him out of the corner of my eye, and I thought that was all that was on the car. As I came down the street someone said, 'There is someone on the back of the car,' so there must have been more than one. And I cut the wheels to turn into Belt Road and at this time I put the brakes on because I knew I was going too fast if there was someone on the back of the car."

Officer Bongers, who made the accident report, testified that Tom told him only what was in the statement. This was corroborated on cross-examination, when he testified: "I believe he remembered there was three on the car. He stopped and one jumped off. He did not know if there was one or two or three". The officer stated further that Tom did tell him that when he saw one get off he thought that was all that was on the car, and that later on, after that, he was told that there was still someone on the car. Taking the statement at face value, as I must do for the purpose of the motion, it must be read as a whole. "I don't know whether there was one, two, or three that jumped on the back of the car", is in the present tense, as of Tom's interview with the officer. Although he received notice as he went up the hill toward 39th Street that there was someone on the back of the car, he later saw a person jump off when he stopped or slowed down for the stop sign, and he thought that the only person who had been on the back of the car had left it. Some place in the block between 39th and Belt Road Tom was again put on notice that someone was on the back of the car, but his statement does not tell at what point he received this notice.

There is no evidence that it was the custom of members of the teen-age group to ride home on the back of cars or of any other circumstance from which there could reasonably be deduced constructive notice to Tom that persons might attempt to ride on the back of the car. As to any custom of Fred as an individual, the evidence is that he had never attended any function of this group before and that Tom did not know him. While Tom did learn that someone was on the back after he started off, according to the plaintiffs' evidence he thought the only person there had gotten off the car. There is authority that persons are not required to search their cars for trespassers except where the presence of small children may reasonably be anticipated. This case is not within the exception.

The earliest actual notice to Tom which might be deduced from the evidence is, therefore, the statement which Kathai Allen heard "no more than four houses" east of Belt Road.

We come then to the question whether notice at the uncertain distance of "four houses" from Belt Road was sufficient for Tom to have acted differently than he did, in the exercise of due care.

According to Tom's statement to the police, he heard that someone was on the back of the car as he came down the street, he cut the wheels to turn into Belt Road, and at that time he put the brakes on because he knew he was going too fast "if there was someone on the back of the car."

Paul Murray testified that at the intersection of Garrison Street and Belt Road they were going down twenty-five miles an hour and it seemed like Tom "just grabbed the wheel and pulled it to the left" at the intersection; that the car was packed and it seemed to him that the car wasn't going to make it around the turn. He testified on cross-examination that he did not see anything wrong with Tom's driving when he started off after stopping for Linton to get off the front fender; that Tom never exceeded the speed limit; that he made the turns at the jog in Garrison at 39th at about five or ten miles an hour; that he was going "maybe twenty-five" miles per hour at the turn into Belt Road.

According to Michael Dundon, Tom made the first turn at 39th and Garrison at about ten miles per hour, the second turn at that intersection at about fifteen, and increased his speed on the downhill grade between 39th and Belt Road to about twenty-five, which was the highest speed reached. At first he stated that he did not remember whether he felt any decrease prior to the start of the turn into Belt Road, and that in his opinion Tom could not have made the turn. On cross-examination, however, Michael testified that he believed the car was being properly operated when Tom was making the left turn into Belt Road; that Tom had put on the brakes before making the turn and reduced his speed from twenty-five miles, although he could not say how much, repeating that he did not believe Tom could have made the turn and it was his opinion Tom applied the brakes too late; and that while they were in the turn somebody yelled that Fred had fallen off and Tom brought the car to a complete stop, coming to rest pointing to the southwest curb, with part of the car on Belt Road and the back end still in the intersection.

Kathai Allen testified that between 39th and Belt Road the car was being operated about twenty-five miles an hour; that Tom did not make a particularly sharp turn, but just a normal left turn, so far as she could see; that before the turn the speed of the car had been decreased "just a little bit" to make the turn; that after somebody said that Fred had fallen off, Tom immediately came to a full stop, not in a complete turn, but "sort of headed" toward the curb.

Officer Bongers of the Accident Investigation Unit testified that when he arrived the defendant's car was stopped facing in a southwesterly direction on the left side of Belt Road south of Garrison with the rear end extending back into the intersection; that there were "high pressure skid marks" which started on Garrison Street forty-three feet east of Belt Road, and extended in a curve across the intersection twenty-four feet. The officer drew on the blackboard the curve across the intersection, starting east of Belt Road and crossing the intersection in a wide, rounded turn. Officer Bongers testified that a high pressure skid is not the full width of the tire, but is made when a vehicle turns one way or the other and the weight of the vehicle is thrown right or left, putting the edge of the tire in contact with the road. He testified that, from his experience, one does not necessarily have to apply brakes to get a high pressure skid mark; that they are also made by suddenly changing the course of direction; that a little bit too much speed

will shift the weight of the car suddenly and instead of getting the flat portion of the tire in contact with the pavement it will be on the side. He further testified that with weight on the car you will get such a mark; that the experts should have the differences with weight figured out mathematically; but he did not claim to be an expert or able to give the mathematical formula.

This summary shows that all of the eyewitnesses testified Tom at no time exceeded the speed limit; that two of the three testified that he braked before making his turn at the intersection, and the other did not recall. Although one witness stated Tom grabbed the wheel and pulled to the left and two of the witnesses testified that in their opinion Tom could not have made the turn if he had not stopped, the remaining eyewitness said the turn was a normal left turn, not abrupt or sharp. The latter's testimony was corroborated by the skid marks of the wide, rounded turn across the intersection. All the eyewitnesses agreed that as soon as someone called out that Fred had fallen the driver came to a full stop without completing his turn. The only testimony as to the cause of the high pressure skid marks was that such marks could be caused not only by braking, but by turning suddenly, or by the shifting of the weight of the vehicle on a turn. The position of the skid marks showed the turn was not abrupt. The evidence showed that the car was heavily weighted in its turn. The physical evidence of the skid marks within the intersection and the uncompleted turn are consistent with the testimony of the three eyewitnesses and Tom's statement to the police officer that he came to a full stop upon learning, after he started his turn, that Fred had fallen from the car. There is no evidence as to whether the car was in or out of the intersection at the moment Fred fell.

Without doubt it was negligence for Tom to drive the car with six passengers crowded in the back seat and in the confusion and noise of nine occupants in one sedan. This negligence, however, was not relied upon by the plaintiffs in the pretrial order or at the trial, nor could it be, since Fred, as a trespasser, must be held to have taken the car as he found it, including any continuing negligent condition existing at the time he chose to ride on it.

Upon this whole record I find there is no evidence from which the jury could deduce that defendant's agent was guilty of any active negligence after learning of Fred's presence on the car, and that any such finding would necessarily be based on pure speculation and conjecture.

Fifth, *a fortiori*, I find as a matter of law that there is no evidence on which a reasonable man could base a finding of intentional, willful, or wanton negligence on the part of the defendant's agent, which could make for liability of the defendant to the plaintiffs if Fred be found to have been a trespasser whose presence was not known prior to the accident.

Not only do I find that plaintiffs have failed to adduce evidence which would permit me to submit the issue of negligence to the jury, but I further find that the plaintiff Fred was negligent as a matter of law, and that there is no evidence upon which the jury could find for the plaintiffs on the doctrine of last clear chance. Fred, a very intelligent boy of seventeen at the time of the accident, testified that he knew then that it was very dangerous to ride on the back of an automobile. Further, plaintiffs' exhibits included photographs of the particular automobile from which Fred fell, a 1952 Nash sedan, showing a generally horizontal rear deck, with somewhat rounded contours and nothing which could be used as a handgrip by a person riding on the back of the car. Inasmuch as I find there is no evidence of exactly when Tom was put on notice that there still was somebody riding outside on the rear deck or that Tom acted negligently after such notice, whenever received, there is no evidence on the issue of last clear chance.

With full realization that "Only if reasonable men could not reach differ-

ing conclusions on the issue may the question be taken from the jury",[1] the court is constrained to adhere to its granting of the defendant's motion for a directed verdict.

1. Baker v. Texas & Pacific Railway Co., 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed. 756.